[S. F. No. 8968.   In Bank.—August 3, 1920.]

## JOHN H. BRIMBERRY, Respondent, v. DUDFIELD LUMBER COMPANY et al., Appellants.

[1] NEGLIGENCE—CONFLICT OF EVIDENCE—FINDINGS—APPEAL.—Where, in an action to recover damages for personal injuries to a motorcycle rider in a collision with an automobile, the evidence on each of the questions involved in the issue of contributory negligence is substantially conflicting, the findings negativing such negligence will not be disturbed on appeal.

[2] ID.—COLLISION OF AUTOMOBILE WITH MOTORCYCLE—NEGLIGENCE OF EMPLOYEE — LIABILITY OF EMPLOYER — BUSINESS ERRAND AFTER OFFICE HOURS.—An employer is liable for personal injuries received by the rider of a motorcycle in a collision with an automobile negligently driven by an employee, where the automobile was purchased by the employer and was used by the employee both in the service of his employer and on his own business, and at the

---

2. Liability of owner of automobile for acts of his chauffeur or agent, notes, 10 Ann. Cas. 732; 12 Ann. Cas. 972; Ann. Cas. 1914C, 1087; Ann. Cas. 1916A, 659; Ann. Cas. 1917D, 1001.

Liability of master where car is being used by servant or another for his own business or pleasure, notes, 1 L. R. A. (N. S.) 235; 9 L. R. A. (N. S.) 1033; 14 L. R. A. (N. S.) 216; 21 L. R. A. (N. S.) 93; 26 L. R. A. (N. S.) 382; 33 L. R. A. (N. S.) 79; 37 L. R. A. (N. S.) 834; 47 L. R. A. (N. S.) 662; L. R. A. 1916A, 957.

time of the accident the employee was returning from a business errand for his employer performed after office hours and was proceeding toward the office, which was on his way home, to procure his overcoat, which he had forgotten.

APPEAL from a judgment of the Superior Court of Santa Clara County.   John L. Hudner, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

John G. Jury, Louis Oneal and Oneal & Sex for Appellants.

Norman E. Malcolm for Respondent.

LAWLOR, J.—This is an appeal from a judgment for one thousand two hundred dollars against the defendants, Dudfield Lumber Company, a corporation, and Joseph A. Jury, and in favor of the plaintiff, John H. Brimberry, in an action to recover damages for injuries alleged to have been suffered by him as the result of negligence on the part of defendant Jury in the course of Jury's employment by the defendant corporation.   The record before us is presented under the alternative method.

The following facts are undisputed.   Jury was the secretary of the Dudfield Lumber Company, whose offices were in the city of Palo Alto.   He testified that prior to December 11, 1917, the company had purchased an automobile which was registered in his name and turned over to him for his use.   On the last-mentioned day, about 4:30 P. M., Jury left the office of the company in the automobile and drove to Camp Fremont to have a check countersigned at the office of the Lindgren Construction Company at the camp.   He returned from the camp to Palo Alto via the state highway. On arriving at the intersection of the state highway with University Avenue, at the entrance to Stanford University, he collided with a motorcycle, on which the plaintiff and one Leslie C. Kees, both sergeants in the United States army, were returning from Mayfield to Camp Fremont.   By the force of the collision the plaintiff was thrown from the motorcycle and suffered the injuries for which he now seeks damages.   The cause was tried before the court without a jury. The court made findings of fact and conclusions of law and

rendered judgment in favor of the plaintiff and against both defendants in the sum of one thousand two hundred dollars.

1. We shall first consider appellants' contention "that the decision is against law," in that "the evidence conclusively shows negligence on the part of the respondent, and that his said negligence was a proximate and contributing cause of the injuries sustained by him, and that, therefore, the court erred in giving judgment for the respondent herein." In this connection we shall also consider the following four propositions advanced in appellants' opening brief: (1) "The evidence is insufficient to justify the decision that the motorcycle driven by plaintiff and Leslie C. Kees was driven on the right side of the state highway . . . or that the plaintiff or . . . Kees proceeded carefully or with 'due 'care to drive said motorcycle across said intersection' "; (2) "The evidence is insufficient to justify the decision 'that the plaintiff and . . . Kees were not operating and driving said motorcycle . . . in a careless, negligent, and imprudent manner,' or 'that they were not going at a rate of speed greatly in excess of that which was reasonable and proper, having regard to the traffic and use of said highway' "; (3) "The evidence is insufficient to justify the decision 'that said collision and all injuries and damage suffered by plaintiff as a result thereof were not wholly or in any way due to want of ordinary care on the part of the plaintiff, or to plaintiff's own negligence, or to the negligence of his associate and companion, . . . Kees' "; and (4) "The evidence was insufficient to justify the decision 'that there was no want of care and no contributory or any negligence of the plaintiff whereby the injuries and damage suffered by the plaintiff were brought upon himself.' " It is well to call attention to the fact that at the point where the collision occurred, the state highway, about sixty feet wide, runs northwest and southeast; that at the intersection, University Avenue, about the same width, runs northeast and southwest; that, owing to the wide entrance to the university grounds and the curve of University Avenue, the crossing or intersection presents an open road space about two hundred feet in diameter; that, about thirty feet west of the concrete curb along the eastern side of this open area and running parallel to said curb, are the tracks of the Peninsular Railroad, which runs between Palo Alto and Mayfield, and at this point turns from Univer-

sity Avenue into the state highway; that about two feet northeast of the property line on the northeast side of the highway and thirty-four feet northwest of the property line on the northwest side of University Avenue is a "trolley pole"; and that between this pole and the intersection of the two roads is a rough, unpaved area across which, it appears, it was customary for vehicles to pass when making the turn from University Avenue to go north on the highway.

Kees, the driver of the motorcycle, testified that, as he was returning from Mayfield to Camp Fremont on the right-hand (east) side of the highway, he approached the intersection at a speed of about twenty-five miles an hour; that he noticed a Ford car coming toward the intersection along University Avenue and that he thereupon slowed down to a speed of not more than twelve miles an hour in order to allow the Ford car to pass in front of him, at the same time swerving "a little bit to the right"; that the Ford car passed across the highway in front of him and went "out into the University grounds"; that after the Ford car had passed in front of him he saw Jury's car coming down the highway, but that, inasmuch as Jury was looking "out University Avenue as though he was going to turn in that direction and follow the Ford," he took no further notice of Jury and proceeded north on the east side of the highway; that just as the witness "neared the corner of the property line of University Avenue with the state highway," Jury made a sharp turn toward him "cutting several feet from the center of the intersection," so that the witness, "not having time enough to turn to my left and give him the wrong side of the road," set his brakes and "was compelled to swerve more to the right to avoid a head-on collision"; that immediately thereafter the car which Jury was driving struck the rear wheel of the witness' motorcycle on the left-hand side, throwing Sergeant Brimberry off, so that he rolled about twenty feet to "within a few feet of the trolley pole"; and that he "couldn't state" how fast Jury was traveling at the time of the collision.

Miss Cornelia Kempff testified that at the time of the collision she was driving her automobile west on University Avenue, intending to turn north into the highway in order to return to her home in Atherton; that she was driving near the center line of University Avenue for the reason that "it

was a little bit rough'' near the trolley pole; that before she
reached the intersection a Ford car, going in the same direc-
tion, passed her on her right and ''started to crowd in ahead,
so I swerved out a little bit to make my turn''; that she
saw the plaintiff and Kees just as another car passed in
front of them; that they were traveling on the right-hand
side of the highway, ''in fact, they were a little too much to
the right, if anything''; that at the time of the collision the
front wheels of Jury's car were in the rough space near the
trolley pole and she thought the rear wheels were there, also;
that plaintiff was thrown from the motorcycle and ''rolled
two or three times before he stopped'' near the trolley pole;
and that she had told Jury he ''was on the wrong side of the
road.''

Plaintiff corroborated the foregoing testimony.   He declared
that at the time of the collision Jury ''was not going very
fast or very slow, and we were not going very fast either'';
and that he did not see Jury's car until after the Ford car
had passed in front of the motorcycle.

On this point Jury testified that as he approached the scene
of the collision, traveling south on the west side of the high-
way, he noticed a Ford car coming out of University Avenue
across the highway, and that the driver of the Ford car
''seemed to hesitate as to what way she was going''; that
because of this seeming hesitation he ''naturally slowed up
and kept on to the extreme right until she passed out of my
way''; that just as the Ford car passed across the highway
the motorcycle on which plaintiff and Kees were riding
at a speed of ''about thirty-five miles an hour, I imagine, . . .
shot around the back of the Ford''; that the plaintiff and
Kees were traveling on the west side of the highway; and
that he first saw the motorcycle when ''it swept around in
back of the Ford.''   On cross-examination he said that the
reason he thought the plaintiff's speed was thirty-five miles
an hour was because ''they came around back of that ma-
chine at an angle of thirty-five degrees.''

Mrs. Anabel Titchworth, a witness for the defense, testi-
fied that at the time of the collision she, with two other
women, was driving a Ford car west on University Avenue
at a speed of about twelve miles an hour; that as she reached
the highway she saw the motorcycle ''zigzagging all over the
highway, and that frightened me''; that she thought the

motorcycle was going "two or three times faster than I," and that it did not slow up on reaching the intersection; that she was "too frightened" to notice any other details of the collision; that the reason why she thought the motorcycle was traveling fast was that "it looked to me as if they were going to run into me"; and that she could not state what direction the motorcycle took after it passed behind her car.

Mrs. Isabella Telmont and her daughter Irma, witnesses for the defense, who were in Mrs. Titchworth's car at the time of the collision, corroborated the latter's testimony.

Bruce Hight, a witness for the defendants, testified that just prior to the collision he was driving a delivery car west on University Avenue at a speed of about twenty-five miles an hour; that he passed Miss Kempff's automobile on University Avenue before he arrived at the intersection; that he was about 120 feet east of the intersection when he first saw plaintiff and Kees on the highway about seventy-five yards south of the center of the intersection traveling "not under thirty miles an hour, either on the center [of the highway] or over it—on the left"; that the motorcycle passed in front of him and just behind Mrs. Titchworth's car; that he turned south on the highway and did not see, but heard the crash of the collision; that he immediately turned around and drove back to the intersection; and that he saw the motorcycle about eight feet south of the trolley pole lying in a pool of gasoline. On cross-examination he admitted that he was not certain whether, at the time when plaintiff and Kees crossed the intersection, they were on the west side of the highway; that when he reached the intersection of the north-west property line of University Avenue with the highway the plaintiff and Kees were "about the center of the paved part of the highway . . . they had already started to swing out on account of the Ford—to their right"; and that he did not know at what rate of speed they were traveling when they crossed the intersection after they had passed in front of him.

From this summary of the testimony it is clear that, with respect to the points urged by appellants, including the speed at which the motorcycle was traveling at the time of the collision, the care or lack of care with which Kees was driving the motorcycle, and the side of the highway upon which plaintiff and Kees were traveling, the evidence is involved in

substantial conflict.  First, with regard to appellants' claim of contributory negligence.  As to the speed and the manner in which he was driving the motorcycle, Kees stated that he was "going ten or twelve miles an hour," he having slowed down from twenty-five miles an hour.  The plaintiff testified somewhat indefinitely that the motorcycle was "not going very fast, either."  On the other hand, Jury stated that it was moving "about thirty-five miles an hour," admitting, however, that he had not seen the motorcycle until it swept around in rear of Mrs. Titchworth's car.  Mrs. Titchworth stated that the plaintiff and Kees were "zigzagging all over the road," and were going "two or three times faster than I was," but she also testified that she was "too frightened," and thought that the motorcycle was going to run into her machine.  Hight said he thought the speed of the motorcycle was about thirty miles an hour.  As to the course of the motorcycle with reference to the center line of the highway, Kees said that he approached the intersection on the right-hand side and later swerved "a little bit more to the right."  He was corroborated on this point by Miss Kempff and the plaintiff.  And Jury stated that at the time of the collision the motorcycle was on the west side of the road.  Mrs. Titchworth said she could not state what direction was taken by the motorcycle after it passed in back of her car.  Hight declared that the point at which he saw some gasoline spilled and at which he thought the collision took place was about "eight feet south of the telegraph pole," which would be on the east or right-hand side of the highway.  Thus, on each of the questions involved in the issue of contributory negligence, there was a substantial conflict in the evidence.  [1]  The findings, therefore, negativing contributory negligence will not be disturbed.

2.  Appellants' second contention is that "the evidence is insufficient to justify the decision 'that the wrongful and negligent acts of the defendants brought about said injuries and damage to the plaintiff'; or that . . . 'Jury operated . . . said automobile carelessly or negligently at said inter-section'; . . . or that he 'did negligently drive said automobile far to the left of the center of said intersection, cutting the corner thereof short'; . . . or that by reason of any careless or negligent acts of said defendant, said collision occurred."  It is not necessary again to review the evidence

in order to point out that each of these questions of fact is involved in conflict. We think this is abundantly clear, and that the findings are amply supported by the evidence.

3. Since we have reached the conclusion that the findings negativing contributory negligence and holding that the defendants were guilty of negligence which caused the injuries to plaintiff are supported by the evidence, it only remains to consider appellants' final contention, "that, under the evidence, the judgment herein against the Dudfield Lumber Company under the rule of *respondeat superior,* was, as a matter of law, clearly and wholly erroneous." The court found "that at all times mentioned in the complaint, the said Joseph A. Jury was engaged in the business of the Dudfield Lumber Company as an employee of said company, and said Jury, at the time of the infliction of the injuries on plaintiff herein mentioned, was riding in and driving the automobile and that said automobile was . . . owned by defendant Dudfield Lumber Company . . . and was at the time of the infliction of these injuries in use by said Jury in and on the business of said company." The defendant Jury was made a witness for the plaintiff. Regarding the events of December 11th, he testified on direct examination: "Q. What time did you leave the Dudfield Lumber Company's office that afternoon? A. That afternoon I left about 4:30. Q. Where did you go? A. I was on my way home. Q. Where do you live now? A. Mayfield. . . . In receiving a check from the Lindgren Company, Mr. Gowing neglected to countersign it, and the bookkeeper handed the check to me and said, 'You might run around by Camp Fremont and have Mr. Gowing countersign this check and bring it to me in the morning.' Q. Did you do that? A. I did. Q. What was that check for? A. For material furnished. Q. Purchased from the Dudfield Lumber Company? A. Yes. Q. And then you had gone up to Camp Fremont to get this check countersigned? A. Yes, sir. Q. And were returning from Camp Fremont at the time of the collision? A. I was on my way home then. Q. You use this machine in going from your office to your home, do you not? A. Yes, sir. Q. Every day? A. Yes, sir. Q. And in the scope of your employment, that is a part of the way you get to and from your business, is it not, by the use of this machine? A. Yes." Upon cross-examination the witness gave the fol-

lowing testimony: "Q. When this check was signed were you through with your work for the day? A. I was; yes. Q. You were through with your work for the day at the time you left the Dudfield Lumber Company about 4:30, were you not? A. I was. Q. Except the getting of this signature on the check? A. Yes, sir. Q. Were you on the business of the Dudfield Lumber Company at the time of this collision? A. No, sir. Q. The Dudfield Lumber Company had nothing to do with it? A. Not a thing." Jury was next called as a witness for the defense and testified as follows on cross-examination by the plaintiff's attorney: "Q. Where were you going? A. I was going into Palo Alto. . . . Q. Then you were not going on into Mayfield? A. I was on my way home. In going into Palo Alto I had forgotten my overcoat; was going in after my overcoat. Q. You intended to turn into University Avenue to go to Palo Alto? A. Yes." And on redirect examination he testified: "Q. When you were going back to get your overcoat, Joe, you were not in the business of the Dudfield Lumber Company, were you? A. No, sir." Kees, when asked if at the time of the accident Jury was going to the office of the Lumber Company, answered: "He apparently was."

Shearman & Redfield on Negligence, sixth ed., vol. 1, sec. 147, lays down the rule that "Where a servant is allowed by his master to combine his own business with that of the master, or even to attend to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured by his negligence; but the master will be held responsible, unless it clearly appears that the servant could not have been, directly or indirectly, serving his master in the act, the negligent performance of which caused the injury." (See, also, *Patten* v. *Rea,* 2 Com. B. (N. S.) 606, 140 Eng. Reprint, 554.) In *Rahn* v. *Singer Mfg. Co.,* 26 Fed. 912, the court charged the jury in substance (see syllabus): "In order to fix the responsibility of the defendant, it is not necessary for the plaintiff to prove that the servant, for whose tort he seeks damages, was, at the time of the commission of the tort, engaged in executing specific commands of the defendant. It is enough for him to prove that the servant was acting within the general scope of his employment, but this much is necessary. If the usage of the parties,

under the servant's contract of hiring, was of such a character that it allowed the servant to attend to his duties on such terms as suited his convenience, and at the time of the commission of the tort he was engaged in his own private business, but at the same time was pursuing the defendant's business in the service for which he was employed, the defendant would still be liable." [2] In our opinion the principle announced in these authorities is applicable to the facts of this case, and clearly the testimony of Jury himself that the automobile was purchased by the company and was used by him both in the service of the company and on his own business, that his trip *to* Camp Fremont was for the purpose of having a check countersigned for the company, and that he intended to proceed to Palo Alto to get his overcoat, is sufficient to sustain the finding that at the time of the collision he was acting in the course of his employment.

Appellants contend further "that the having of the particular paper countersigned was not within his general employment. It was an isolated—a single act, . . . a mere matter of convenience, a mere accommodation." In *Chamberlain* v. *Southern California Edison Co.*, 167 Cal. 500, [140 Pac. 25], the plaintiff had been injured through the negligence of one Rosso. It appeared that Rosso was the driver of an automobile truck for the defendant and was regularly engaged in distributing supplies, but that at the time of the injury he was, pursuant to the orders of defendant's storekeeper, towing an automobile belonging to a fellow-employee. The court said: "It makes no difference that Rosso's usual employment was the distribution of supplies. His business was to operate his motor truck under the orders of his superior, and that was exactly what he was doing at the moment when his carelessness caused the injury to plaintiff." Here, too, the employee had undertaken the trip to Camp Fremont on business of his employer, although such business was not in the line of his usual duties.

This conclusion renders it unnecessary to discuss appellants' point that the evidence is insufficient to justify the finding that the automobile used by appellant Jury was the property of the corporation.

Judgment affirmed.

Olney, J., Lennon, J., and Angellotti, C. J., concurred.

WILBUR, J., Concurring.—I concur in the judgment against the Dudfield Lumber Company for the reason that at the time plaintiff was injured Jury was returning to the office of the Dudfield Lumber Company from an errand for the defendant company on which he was sent by the bookkeeper. The court having decided against the credibility of his testimony as to the manner in which the accident occurred, was, therefore, also justified in disregarding his statement that he merely turned aside to the office for his overcoat while returning to his own home, and in concluding that he was merely completing a journey to and from the office on the business of the company. As to the other points in the case, I concur with Justice Lawlor's conclusions.

SHAW, J., Dissenting.—I dissent. In my opinion Jury was not in the service of the company, and was not its agent for any purpose at the time of the accident.

The fact that he had been in its service during the preceding part of that day does not compel the conclusion that he was in its service at that time. The fact that he was then driving an automobile belonging to the company did not, under the circumstances appearing, make him its servant or agent. He was not driving it for, or on behalf of, the company, nor in its work or service. He lived at Mayfield and worked for the company as its secretary at its office in Palo Alto. He used the car after office hours in the evening and before office hours in the morning in going to and returning from his home in Mayfield. This was with the consent of the company, but not by its direction, nor in the transaction of its business. In contemplation of law he merely borrowed the car for his own use in so doing. He was not hired either to go to his home from the office in the afternoon, at the close of his work for the day, or to go from his home to the office in the morning to begin his work for the day, or to use the car in going or coming. That formed no part of his service; while so going and returning he was not in the service or under the employment of the company, and for his negligent acts in so doing the company was in nowise liable.

Ordinarily, he ceased to be in the service of the company the moment he left its office for his home. On the day of the accident, as he was about to leave for home, he was di-

rected to go to Camp Fremont, which was in the opposite direction from his home, and there get a check countersigned, which he was to keep and bring to the office the next morning. While on his way to Camp Fremont, and while engaged in getting the check countersigned he was doubtless in the company's service. But when that task was completed his service for the company ceased for the day, so far as his goings and comings were concerned, and the company then ceased to be liable for his negligence in driving the car. It was no concern of the company how or by what route or means he got from Camp Fremont to his home, or whether he got there at all. It so happened that Camp Fremont was on the state highway a mile north of Palo Alto, while Mayfield was on said highway a mile or more south of Palo Alto. Consequently, in going home from Camp Fremont on the highway he had to pass through Palo Alto. If he had been turning into Palo Alto for groceries to take home, it would be conceded that the company would not be liable. If he had been directed to take a check to Los Altos, and after doing so had gone to his home, without passing Palo Alto, the same result would follow. Apparently, according to the majority opinion, the company's liability depended on the direction he had to go to get the signature. There is no evidence that he was intending to call at the office of the company on its business on his return from Camp Fremont. He had not been directed to do so, and as it was 5 o'clock in the afternoon and he had already left the office for the day, no reasonable inference to that effect is deducible. It is said he was going there for his overcoat. The evidence shows merely that he was turning down University Avenue toward Palo Alto in order to get his overcoat, which he had forgotten. It does not show that the overcoat was at the office. But it is immaterial where it was. The company did not engage him to look after his own clothes, and it was not liable for his negligent acts while he was doing it. The decision appears to be contrary to all authority. (See 2 Mechem on Agency, secs. 1896–1909, where the exact question is extensively treated. Also *Mauchle* v. *Panama-Pacific I. E. Co.*, 37 Cal. App. 715, [174 Pac. 400]; *Slater* v. *Advance T. Co.*, 97 Minn. 305, [5 L. R. A. (N. S.) 598, 107 N. W. 133]; 2 Corpus Juris, 853; 20 Am. & Eng. Ency. of Law, 178; 26

Cyc. 1536; 6 Labatt on Master & Servant, secs. 2274, 2283.) Rehearing denied.

Angellotti, C. J., Lawlor, J., Lennon, J., and Olney, J., concurred.

Shaw, J., Wilbur, J., and Sloane, J., were absent.